IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 19, 2002 Session

## STATE OF TENNESSEE v. WENDELL CLARKE CHAMBERS

**Direct Appeal from the Circuit Court for Stewart County**
**No. 04-1303-CR-00     Allen W. Wallace, Judge**

_____

**No. M2001-02674-CCA-R3-CD - Filed April 22, 2003**

_____

Following a jury trial, the defendant was found guilty of first degree premeditated murder and reckless homicide. The reckless homicide conviction was merged with the murder conviction and the defendant was sentenced to life imprisonment. The defendant appeals, arguing that the evidence was insufficient to support his conviction and that the trial court erred in overruling his motions for judgment of acquittal and in allowing a videotape and photograph of the crime scene into evidence. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

Jerry C. Colley, Columbia, Tennessee, for the appellant, Wendell Clarke Chambers.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Carol Mathis, a dispatcher for the Stewart County Sheriff's Department, testified that she received a 9-1-1 call from the defendant, Wendell Clarke Chambers, at 10:44 p.m. on August 17, 2000, the defendant stating, in part:

DEFENDANT: My girlfriend has been beaten to death and robbed.

911: Your girlfriend? She hit you?

. . . .

> DEFENDANT:  No.  No.  We've been robbed.  We've been robbed.
> Somebody knocked our door in and they beat us and robbed us.  I
> don't know her condition.
>
> 911:  Okay.
>
> DEFENDANT: Please, I need 9-1-1.  I don't know how she is.  As to
> what's wrong, I can't see.

Stewart County Sheriff's Chief Deputy Derrick Wyatt testified that he was dispatched to the defendant's residence at 10:44 p.m. on August 17, 2000, in response to a breaking and entering complaint.  He arrived at the scene at the same time as Deputy Marcus Brigman and Patrolman Donnie Deal.  As the others stayed back, Chief Deputy Wyatt approached the front of the defendant's trailer where he was confronted with a screen door that was latched from the inside.  When he knocked and identified himself, the only response he received was from the defendant's dog, which was "throwing a fit" inside the screened-in porch.  To enter the screened-in porch, he "pulled the latch loose from the door," and the barking dog "darted out the door."  Chief Deputy Wyatt described what he encountered next:

> As I approached the entrance to the trailer, there was a storm door on
> the trailer.  I observed it closed.  And the main entrance door . . . was
> open approximately 18 inches.  As I approached closer where I could
> see over the bottom of the storm door, I observed from about the
> knees down of two white . . . legs and what appeared to be
> bloodstains on the legs and around them.

He looked for blood tracks leading out of the trailer and saw none which, in addition to the door being locked from the inside, led him to believe that the perpetrator might still be inside.  Upon entry, the officers saw a "white female that appeared to be deceased" lying face up on the floor and a white male, identified as the defendant, lying face down against the couch.  After a protective sweep of the other rooms, officers determined that there was no one else in the trailer.

Chief Deputy Wyatt testified that, because the defendant noticeably was breathing, he had one of the paramedics enter the trailer to check on the defendant while he secured the crime scene.  They rolled the defendant over onto his back and began to medically examine him and ask what had happened.  In a conversation that went "in and out," the defendant said that "a man broke into the house, hit me in the head with a boat paddle," and then the defendant "fell over face first in [sic] the floor and . . . put his body in a jerking motion, . . . a floppy motion on the floor."  Chief Deputy Wyatt described what happened next:

I looked at the EMTs because I have no idea what's going on, and undoubtedly they did not either. They looked back at me with the same expression. [The defendant] did this for a few seconds, stopped as quick as it started . . . raised his head, looked at the EMTs and said I'm having a seizure, went right back into this, lasted again a few seconds. He stopped again just as quick as he started, kind of turned his head to the EMTs again and he says, look, I'm having a seizure, do you not know what a seizure is, went back into this motion again in [sic] the floor.

At that time the EMT, Mr. Wright, starts instructing that he's not having a seizure, that he needs to sit up, explain to him what's happening so he can take care of him.

The defendant appeared to have a scratch on his head and, aside from an open brown bathrobe, was naked. The victim was "totally nude." As to the defendant's appearance, Chief Deputy Wyatt testified that "[t]he first thing that jumped out to me was all the blood that was surrounding the body and was also on the body of [the victim]. The first obvious thing that stood out was how clean [the defendant] was."

Chief Deputy Wyatt searched the crime scene area for a visible sign of entry, the boat paddle, and the weapon that had been used to kill the victim, who had stab wounds "all over her body." In the kitchen, he observed bloodstains on the cabinets, diluted blood in water in the ice cube trays in the sink, and blood on dishes and utensils that were in the sink. Also in the sink were a chipped plastic bowl and the corresponding chip, which appeared to have hair and blood on it. A "large black handled knife with what appeared to be bloodstains on the handle" was found in a kitchen drawer. A towel with what appeared to be bloodstains was found in the bathroom. Although the call he received was for a forcible entry, Wyatt was unable to find any evidence of a break-in into the trailer.

Deputy Marcus Brigman of the Stewart County Sheriff's Department testified that he was dispatched to the defendant's residence on August 17, 2000, about a "possible home invasion." While Chief Deputy Wyatt was at the front door of the trailer, Deputy Brigman peered through a back window, testifying: "At the foot of the door I seen [sic] a nude female body, I could see about mid-torso down. She was covered in blood. There was blood all over the carpet." The victim, who had "a severe cut across her throat," was "obviously deceased" and the defendant, who had "no visible wounds," was lying face down between the couch and the floor. Deputy Brigman entered the kitchen where he observed blood on the cabinet and, in a drawer, found a "black long-handled knife" with what appeared to be blood mixed with water on the handle. He could not find any evidence of a break-in.

Stewart County Sheriff John Vincent testified that, upon arrival at the scene, he paid particular attention to search for bloody footprints or hand prints left in or out of the trailer and did not see either. He found a bloody pair of men's boxer shorts on a chair by the door. He testified that

a bloody knife found in the kitchen drawer "appeared to match wounds that was in the victim."

Paul Wright, a paramedic, testified that he was dispatched to the defendant's trailer on August 17, 2000, "on a possible home invasion call." He explained how the defendant "was conscious but . . . wasn't acting that way":

> A.    I noticed his eyes twitching a whole lot and that's not usually right with someone that's unconscious. Their eyes will move, you'll see them move, but it's how a small kid will shut his eyes and try to keep them closed to try to fool you.
>
> At that time I did a sternum rub and I got a reaction. I was trying to see if he was conscious or not because the only injury I saw was just a couple of scrapes here on his head.
>
> . . . .
>
> If somebody's unconscious, deep unconscious and you do a sternum rub, it's irritating . . . it's a standard way of checking to see if someone is conscious. If they're unconscious, you won't get any kind of reaction out of that person. If they're conscious even to a slight . . . degree, they're going to move their arms.
>
> . . . .
>
> Q.    What else did you do to determine whether or not he was conscious?
>
> A.    I tested motor sensor activity. If you take a person unconscious and take their hand above their head and you drop the hand . . . it will free fall and just land as anything would if you dropped it.
>
> But if a person's conscious, then it will be a controlled fall and if it will miss the head, then it's controlled, it's controlled movement.
>
> Q.    In response to the sternum rub, what did [the defendant] do?
>
> A.    He moved to the side a little bit, turned his arms and he squeezed his eyes tighter.
>
> Q.    And when you dropped his arm, what did he do?
>
> A.    He controlled the fall beside his head.

Q.    And what did that indicate to you?

A.    It indicated to me that it was very likely he was conscious.

Q.    Did you do anything else to try to see what his condition was?

A.    Yes, sir, I rubbed his eyes and just made him squeeze down tighter, close them tighter.

Wright, who had by now determined that the defendant was conscious, ordered him to "open up his eyes and talk." The defendant opened his eyes and stated that he had been hit on the head with a boat paddle. Wright found no injuries on the defendant other than two lacerations on his forehead.

The defendant informed Wright that he had a "seizure disorder" and shortly thereafter "rolled back over face down to the ground and started bouncing his hips up and down off the ground." As Wright stood back and watched, the defendant stopped shaking and asked, "Don't you know what a fucking seizure is?" before he "continued on with the voluntary movement of his pelvic area." According to Wright, legitimate seizures typically involve, among other things, uncontrollable violent head-to-toe jerking, urination, defecation, and an inability to talk, none of which the defendant experienced. Wright testified that, in his twenty years of employment as a paramedic, he had seen "very many" real and fake seizures and, based on his training and experience, the defendant did not have a real epileptic seizure. The defendant was transported to the hospital and, while in the ambulance, asked about the victim and then about his dog, at which point he got "very, very upset."

Captain Dale Fulgram of the Stewart County Ambulance Service testified that he and Paul Wright responded to the call at the defendant's residence on August 17, 2000. As he tried to examine the defendant, the defendant repeatedly exclaimed, "Quit treating me like a criminal. I didn't do anything wrong. I didn't kill anybody." Then, the defendant made a "humping motion with his hips up and down on the floor" and, as Fulgram expressed confusion about what he was seeing, the defendant said, "It's an epileptic seizure, you dumb mother-fucker. Don't you know a seizure when you see one?" As Fulgram and other emergency medical workers were transporting the defendant to the ambulance, the defendant said, "I'll hack you up, mother-fucker."

Rebecca Brewster, a registered nurse at the Henry County Medical Center, testified that the defendant had "a minor scrape across his forehead," was "restless and angry," and "smelled strongly of alcohol" when he was brought in for treatment. The defendant said, "Don't touch me, bitch" when Brewster attempted to examine him. She described his appearance:

He was received to us initially nude except for a bath[robe]. He was clean. His skin was clean. He had a little dried blood on the abrasion [on] his head, but he had more blood dried around his fingernails and on his feet, the soles of his feet. And his toenails, his

> nail area, he had a lot of . . . what looked like blood inconsistent with
> such a minor abrasion . . . on his head.

The defendant initially refused to have his blood drawn, stating, "I know my rights. You cannot have my blood to pin this killing on me. I want my lawyer." The defendant's blood alcohol level was 0.14%.

Dr. Robert Stevenson testified that he was the treating physician at the Henry County Medical Center and that the results of the CAT scan performed on the defendant's head were "normal." According to his diagnosis, it was unlikely that the defendant had suffered any injury sufficient to render him unconscious. Dr. Stevenson said if the defendant had been struck hard enough on the head with a boat paddle to result in unconsciousness, he would "expect to find some area that's [a] swollen area of impact with some significant swelling." Neither the CAT scan results nor the photograph taken of the defendant an hour and a half after the incident showed such swelling.

Special Agent Joe Craig, a Tennessee Bureau of Investigation ("TBI") criminal investigator, testified that he participated in the investigation of the defendant's residence. He saw no evidence of a forcible entry or bloody tracks leading out of the trailer although he "took careful detail in looking" and "spent a pretty good amount of time with a flashlight out there looking for any indication . . . of blood . . . on the deck . . . that would have been carried from the inside out." He testified that the fresh water in the sink indicated to him that someone, between the time the 9-1-1 call was made and the officers' arrival, had cleaned or run the faucet. From the crime scene, he collected as evidence from a kitchen drawer a black-handled fillet knife, which appeared to have blood and hair on it; a chipped plastic bowl, also with blood and hair, from the kitchen sink; and a pink bath towel, appearing to have blood on it, which he found draped across the shower rod in the back bathroom. Also in the sink, he found a chip which fit the bowl.

TBI Special Agent Margaret Bash, a forensic serologist, testified that she performed DNA tests on the evidence recovered from the defendant's residence. She said that blood on the towel found in the bathroom matched that of the defendant, and that on the blade and handle of the knife from the kitchen drawer matched the blood of the victim. While the defendant was "the major contributor," the victim could not be excluded as "a minor contributor" of the genetic material found on the chipped bowl taken from the sink. The genetic material on the chip from the bowl was "a mixture" of that of the defendant and the victim.

Dr. Charles Harlan, the assistant medical examiner and consulting forensic pathologist for Stewart County, testified that he performed the autopsy of the victim, whose death was the "result of multiple stab wounds and incisions." An external examination of the victim revealed "multiple incisions and stab wounds on various surfaces of the body," contusions to the face and head, a laceration to the face, and incisions on the hands. The incisions on the victim's hands were "consistent with someone grabbing a knife blade in a defensive type of maneuver." The victim had twenty-four stab wounds all over her body, including her neck, some of which were six inches deep. Several of the stab wounds penetrated internal organs, including four to the liver and three to the

lungs. The stab wounds caused a "considerable loss of blood into body cavities," amounting to forty percent of the victim's total blood volume, not including the blood lost externally. The injuries would have "caused enough bleeding so that she would have died of blood loss in about ten (10) minutes," eight of which she would have been conscious. Dr. Harlan testified that the bloodstained knife found in the kitchen drawer was "consistent with an object which could have produced all of the wounds" on the victim.

Testifying as the only defense witness, the defendant said that he and the victim were drinking gin and scotch and watching television when they heard a vehicle enter their driveway. A black male, whom the victim referred to as "Jimmy," got out of the vehicle and approached the trailer.[1] The victim let the man inside and explained that she owed him $300 for a drug-related debt. According to the defendant's testimony, when he informed the man that he did not have the money, the assailant "opened this long coat and he pulled this boat paddle out and he struck me across the head." The next thing the defendant remembered was waking up, seeing the victim in a pool of blood, calling 9-1-1, and then passing out. Sometime thereafter, he regained consciousness, realizing that he was surrounded by police and paramedics. He testified that he is an epileptic with a history of seizures.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his first degree murder conviction, contending that the State failed to prove premeditation.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

---

[1]Sheriff Vincent testified that a person looking out of the window on the front of the trailer would have been unable to see a car pull up to the trailer.

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree premeditated murder, which is defined in Tennessee Code Annotated section 39-13-202(a)(1), (d) (1997) as:

> (1) A premeditated and intentional killing of another;

> (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Several factors tend to evidence premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing.

State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citations omitted).

The defendant argues that the State failed to prove premeditation, saying that it cannot be established simply because death resulted from multiple stab wounds or attempts to conceal the crime.

Taken in the light most favorable to the State, the evidence showed the following: the defendant, armed with a butcher knife, cut or stabbed the victim twenty-four times, with the cuts on the front of her body spread from her lower abdomen to her neck, which had a five-and-one-half-inch incision on the front and four-and-one-half-inch and three-inch incisions on the side and rear. She had twelve incisions between her upper and lower chest and four in her back, in addition to what were described as defensive incisions and contusions on her hands and wrists. The victim would have been conscious for about eight minutes after the attack and lived for ten minutes. The knife used to kill the victim apparently had been rinsed with water and put in a kitchen drawer, and the defendant, in the bathroom, had washed off the victim's blood. After calling 9-1-1 for assistance, the defendant pretended to be having an epileptic seizure as he told responding officers, who found the door latched from the inside, that he and the victim had been attacked by an intruder wielding a boat paddle.

In considering this issue, we will review decisions in which our supreme court determined that a defendant's premeditation had been shown by combinations of the use of a deadly weapon upon an unarmed victim, coolness after the killing, and an attempt to conceal it. Our supreme court, in Bland, 958 S.W.2d at 660, concluded that premeditation had been established by the defendant's shooting the unarmed victim three separate times during the chase, then going to watch the nearby beating and robbery of another unarmed victim, whom the defendant shot twice, the defendant then getting rid of the gun and going to his girlfriend's house to sleep. These facts established the defendant's use of a deadly weapon to repeatedly shoot an unarmed victim and his calmness immediately thereafter, thus showing premeditation.

Similarly, in State v. Nichols, 24 S.W.3d 297, 299 (Tenn. 2000), as the victim and defendant were arguing, the defendant "rose from the [kitchen] table, went toward the kitchen sink, and retrieved a knife from the drain rack," stabbing the victim "twice in her abdomen and once in her upper left chest." Later, "[t]wo freshly washed knives" were found behind the kitchen sink. Id. Concluding that the State sufficiently had proven premeditation, the court noted the "violent and physically abusive relationship" of the victim and the defendant and explained the significance of the facts of the killing:

> Viewing the evidence and inferences therefrom in a light most favorable to the State, this Court finds sufficient evidence to support the jury's finding of both premeditation and deliberation. . . . In committing the murder, Nichols rose from the table at which the couple were arguing, went toward the kitchen sink, selected a knife from the drain rack, and stabbed Oakley three times, each time inflicting a life threatening injury. Afterward, Nichols apparently washed the victim's blood from the knife.

Each of these factors is relevant to either premeditation, deliberation, or both. See Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660. Thus, the evidence before the jury, while not overwhelming, was sufficient to support findings of both premeditation and deliberation.

Id. at 302-03 (footnote omitted).

The defendant argues that the holdings in State v. West, 844 S.W.2d 144 (Tenn. 1992), and State v. Ricky A. Burks, No. M2000-00345-CCA-R3-CD, 2001 WL 567915 (Tenn. Crim. App. May 25, 2001), perm. to appeal denied (Tenn. Oct. 29, 2001), compel our finding that the evidence was insufficient to prove premeditation. However, we respectfully disagree with the defendant's characterization of the holdings of these cases. In West, a single "distant gunshot wound" killed the victim, with the defendant then waiting an hour and a half before calling police, during which time he hid the weapon and went about his business. 844 S.W.2d at 147. The defendant claimed that he was threatened by the victim, who was armed with a crowbar. The court concluded the defendant's indifference after the killing and his hiding of the murder weapon did not establish premeditation. In Burks, the victim's body, in a state of decomposition, was found on a couch on the front porch of a vacant house. 2001 WL 567915, at *2. The medical examiner testified that there were "multiple contusions" on her body and abrasions on her left arm and neck, consistent with a "weapon of some sort." Id. at *5. The cause of death was a subdural hematoma, caused by the "twisting and tearing of the head and moving about of the head." Id. The proof showed that the defendant had severely beaten the victim on at least one prior occasion. On appeal, this court affirmed the trial court's entry of a judgment of acquittal for first degree murder and of a judgment for second degree murder, concluding that premeditation was not established by the defendant's repeated blows with a deadly weapon to the victim.

We distinguish the facts of both West and Burks from those of the matter which we now review because, here, the defendant used a deadly weapon to inflict multiple wounds on the unarmed victim in her neck, chest, abdomen, and back and who was conscious for approximately eight minutes as she was bleeding to death, the defendant then taking elaborate efforts after the crime to make it appear that an intruder was responsible, showing his calmness after the crime. Accordingly, we conclude the holdings in Bland and Nichols are controlling, and the evidence taken in the light most favorable to the State allowed a reasonable trier of fact to find beyond a reasonable doubt that the defendant, with premeditation, killed the victim.

## II. Overruling of Motions for Judgment of Acquittal

The defendant argues that the trial court erred in overruling his motions for judgment of acquittal on Count Two of the indictment which were made at the close of the State's proof and at the conclusion of all the evidence. In Count Two, the defendant was charged with felony murder for the killing of another committed in the attempt to perpetrate aggravated rape. See Tenn. Code Ann. §§ 39-13-202(2), -502(a) (1997). However, as to this count, the jury found the defendant guilty of

the lesser-included offense of reckless homicide, which was merged into the conviction for first degree murder. Accordingly, even if the trial court erred, as the defendant argues, in overruling the motion for judgment of acquittal as to this offense, the error was harmless.

### III. Admissibility of Crime Scene Photograph and Videotape

The defendant argues that the trial court improperly allowed a crime scene photograph and videotape into evidence. He filed a motion in limine urging the trial court to exclude the videotape and any photograph that depicted any part of the nude body of the victim on the grounds that the evidence was inflammatory and unduly prejudicial.

The contested photograph was taken before the body was disturbed and depicts the naked victim on her back surrounded by blood. Several stab wounds to the midsection and a wound to the throat are visible in the photograph. The videotape shows the entire crime scene before it was disturbed, including the outside of the trailer, the screened-in porch, and apparently every room inside, orienting the viewer to the general layout of the crime scene while intermittently focusing on specific evidence, such as a bloodstain on the wall, for example. The victim's body is briefly on the screen several times incidental to the subject of focus in the shot. Twice the victim's body is the intended focal point. The first time, the viewer sees only the victim's legs through the front door, apparently showing how the scene would have appeared to the officers who arrived first; and, the second time, the camera panned over the victim's body a few times, giving a close-up view of her wounds. Each of these two shots lasted roughly twenty seconds within approximately eleven and a half minutes of video footage.

The admissibility of authentic, relevant photographs, or a videotape of a crime scene or victim, is within the sound discretion of the trial judge, and the court's ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. State v. Teague, 645 S.W.2d 392, 397 (Tenn. 1983). To be admissible, a photograph or videotape must be relevant to some issue at trial, and its probative value must outweigh undue prejudicial effect. State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997); Neil P. Cohen et al., Tennessee Law of Evidence § 4.01[18] (4th ed. 2000). "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

The trial court excluded several photographs of the victim as cumulative but allowed into evidence the disputed photograph, explaining:

> I can understand why . . . one of these pictures could possibly have a probative value with Dr. Harlan testifying in the case.
>
> . . . .

I'm going to admit 8e. While it's a gruesome picture, I think it does have its probative value and I think the probative value is not substantially outweighed by its danger of unfair prejudice.

The trial court also explained why the jurors would be allowed to view the videotape:

[The State] has alluded to the fact that they've got statements from the defendant that's going to be read, that he never went to the bathroom . . . . He didn't go clean up. He got to the phone and made a 911 call and went right back off again. But we know that you represented to the jury and to me that his blood was found up there in the sink by DNA testing.

So when I take all that in effect I think this jury just must see that crime scene because . . . [t]his has a tendency to make the existence of a fact as a consequence of determination of an act more probable or less probable than it would be without the evidence. I think the jury needs to see it.

Thus, the trial court found both the photograph and videotape to be relevant under Rule 401. The trial court expressly determined that the photograph passed the Rule 403 balancing test, and it was implicit in the findings as well that the probative value of the videotape was not substantially outweighed by the danger of unfair prejudice.

Arguing that the trial court erred in allowing into evidence the photograph and videotape, the defendant relies on State v. Collins, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998), in which this court concluded that the prejudice substantially outweighed any probative value of six color photographs of a bruised, bloodied, nude, infant victim. The facts of that case are distinguishable, however, from the facts before us as, here, only one photograph and a videotape were admitted; the victim was an adult; and the evidence had probative value.

Additionally, the defendant relies on State v. Banks, 564 S.W.2d 947, 952 (Tenn. 1978), wherein our supreme court determined that the prejudicial effect of crime scene photographs depicting the victim's battered head and body outweighed their probative value, the probative value being "slight" because the photographs were taken after the body had been moved from the scene so that the condition of the ground, which was relevant, was not shown. Id. Here, by contrast, the photograph and videotape were of the undisturbed crime scene as it appeared when the police arrived and showed the condition of the floor and the conspicuous absence of bloody footprints leaving the trailer. The fact that the State sought to prove circumstantially, based upon evidence found throughout the residence, that no intruder had come into the trailer, but the defendant had killed the victim is a further reason for admission of the photograph and videotape.

We agree with the trial court that the photograph and videotape were properly admissible. Both were probative as to whether an intruder had committed the murder and left the trailer without tracking blood and whether the defendant made efforts to conceal that he had committed the crime. Additionally, the photograph and videotape clarified testimony about the crime scene as well as Dr. Harlan's testimony as to the victim's injuries. See Banks, 564 S.W.2d at 950-51 (traditional rule in murder prosecutions is that photographs of the corpse are admissible, subject to Rule 403 balancing, if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993) (crime scene videotape that depicted the victims' bodies as found was highly probative, admissible, and not cumulative when photographs of the victims were also admitted); State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985) (photographs showing blood, a bloody trail, the victim's body as found, and a fatal throat wound were not gruesome and served to supplement and clarify oral testimony describing the crime scene).

Accordingly, we conclude that the trial court did not abuse its discretion in admitting either the photograph or the videotape. This argument is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE